UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| JOHN SIMS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:19-cv-00398-JPH-MJD |
| ) | |
| KELLY INDA, ) | |
| RAYN HARR KULYNYCA, ) | |
| MARY SIMS, ) | |
| BIRSCH, ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

John Sims, an Indiana prisoner, brings this civil rights action alleging that Defendants Kelly Inda, Ryan Harr-Kulynych, Dr. Mary Sims, and Dr. Bertch, were deliberately indifferent to his serious mental health needs. Defendants have filed a motion for summary judgment. Dkt. [96]. Because no reasonable jury could find that the Defendants were deliberately indifferent to Mr. Sims' mental health needs, that motion is **GRANTED.**

**I. SUMMARY JUDGMENT STANDARD**

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown*, 803 F.3d 829,833 (7th Cir. 2015) (internal quotation omitted).

"A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court

1

views the facts in the light most favorable to the nonmoving party and all reasonable inferences are drawn in the nonmovant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## II. FACTS

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to Mr. Sims as the nonmoving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### A. Parties

Plaintiff Sims is an inmate currently confined at the Wabash Valley Correctional Facility (Wabash Valley), having been transferred there from New Castle Correctional Facility (New Castle) in April of 2019. Dkt. 98-5 at 13:10-13. (John Sims Deposition).

Defendant Mary Sims, PhD (Dr. Sims) is a psychologist employed by Wexford of Indiana, LLC (Wexford) at Wabash Valley since April 1, 2017. Dkt. 98-4 at ¶ 2 (Dr. Sims Affidavit). She is a member of a multidisciplinary team directing and supervising clinical programs and providing clinical services and direction, psychological testing and report writing, treatment planning, group and individual treatment, and re-entry planning. *Id.* at ¶ 3. She also supervises other mental health professionals and behavioral health specialists, among other duties. *Id.*

Defendant Kelly Inda (Ms. Inda) is a mental health professional who has been employed by Wexford at Wabash Valley since April 1, 2017. Dkt. 98-2 at ¶ 2 (Inda Affidavit). She works under the license of Dr. Mary Sims. *Id.* at ¶ 3.

Defendant Ryan Harr-Kulynych (Ms. Kulynych) is a mental health professional who was employed by Wexford at Wabash Valley from May 15, 2017, until July 27, 2019. Dkt. 98-3 at ¶ 2 (Ryan Harr-Kulynych Affidavit). Ms. Kulynych was Mr. Sims' primary therapist while she was at Wabash Valley. *Id.* at ¶ 6. She worked under Dr. Sims' license.

Defendant Dr. Brion Bertsch (Dr. Bertsch) is a psychiatrist who has been employed as an independent contractor at Wabash Valley since April 1, 2017. Dkt. 98-1 at ¶ 2 (Dr. Bertsch Affidavit).

**B.     Sims' Treatment at Wabash Valley**

Mr. Sims has a long history of mental health issues and treatment. Dkt. 98-1 at ¶ 6. His diagnoses have changed over time, but his current diagnosis is anti-social personality disorder (ASPD) for which the preferred treatment is therapy and occasional medication. *Id.* Mr. Sims' former diagnoses of borderline personality disorder and psychosis were considered resolved in May 2018. *Id.* at ¶ 5. He was not compliant with his treatment plan at New Castle and made minimal progress. *Id.* Thus, he was discharged from the New Castle mental health unit and transferred to Wabash Valley. *Id.* He was not on any mental health medication at New Castle in 2019 or when he arrived at Wabash Valley. *Id.*

Ms. Kulynych first saw Mr. Sims on April 10, 2019, for his intake assessment. Dkt. 98-3 at ¶ 8. Based on Mr. Sims' medical records, responses to treatment, and behaviors, the treatment team determined that he was not seriously mentally ill (SMI). *Id.* at ¶ 3. Ms. Kulynych had a few sessions with him in April and also saw him on May 3 and 6, 2019. *Id.* at ¶¶ 8-11.

On May 3, Mr. Sims denied suicidal ideations, and there was no indication that his activities of daily living were impaired. *Id.* at ¶ 10. Ms. Kulynuch told him he would be seen weekly and she encouraged his participation in therapy. *Id.*

During their May 6 session, Mr. Sims said he wanted to be transferred to a mental health unit and put on medication. *Id.* at ¶ 11. After Ms. Kulynych told him his behavior had been stable and there was no indication for anti-psychotic medication, he said if he was not transferred to another prison, he would go back to his old ways to prove he was unstable. *Id.* Ms. Kulynych provided psychoeducation regarding his diagnosis and the appropriate treatment, but Mr. Sims was unwilling to engage in therapy. *Id.*

On May 7, Ms. Inda came to Mr. Sims' cell. He told her that he "was hearing voices and the voices told me to kill myself." Dkt. 98-5 at 26:2-3. Mr. Sims had not experienced incidents of self-harm at Wabash Valley before May 7. *Id.* at 38:15-20. Ms. Inda told him that there was nothing she could do for him because she was not his therapist and he would see his therapist again the next day. *Id.* at 25:19-23. Ms. Inda was not aware that he had pills and a razor in his cell, a razor he was not allowed to have. *Id.* at 27:7-19. She observed no clinically significant concerns during the short time she was at his cell door. Dkt. 98-2 at ¶ 8.

After Ms. Inda left Mr. Sims' cell, he started cutting his arm. Dkt. 98-5 at 37:6-13. An officer walked by his cell about an hour later, saw blood and pills on a table, and asked Mr. Sims what he was doing. *Id.* Mr. Sims quickly swallowed the pills. *Id.* He was then taken to a local hospital as a precaution and returned to Wabash Valley the same day after the hospital determined that no medical intervention was required. *Id.* at 40:24-41:2; dkt. 98-3 at ¶ 12. Dr. Sims placed him on constant observation upon his return from the hospital. Dkt. 98-4 at ¶ 9.

Subsequently, Ms. Inda would see Mr. Sims occasionally for suicide watch visits, as would

4

various other mental health staff. Dkt. 98-2 at ¶ 11. He would regularly refuse to speak with her, yell profanities at her, and expose himself to her. *Id.*

Mr. Sims asked that for prescription psychiatric medication on May 13, but Ms. Kulynych did not believe that a referral was appropriate. Dkt. 98-3 at ¶ 13. Mr. Sims had displayed intermittent anger and agitation in response to stressors as well as goal-oriented attempts to look like he was talking to himself when she walked by his cell. *Id.* There were no signs or symptoms of depressive anxiety related to a psychiatric disorder at that time. *Id.*

Ms. Kulynych continued to see Mr. Sims on a weekly basis during which she tried to build therapeutic rapport, address problematic behaviors, and discuss positive coping skills. *Id.* at ¶ 14. She made repeated attempts to encourage him to engage in therapy. *Id*. at ¶ 6. She also conducted multiple in-person and telephone case consultations with supervisory staff regarding his treatment plan. *Id*. at ¶ 5. He sometimes reported feeling depressed, stressed, and hearing voices. *Id.* at ¶ 16. In late May, Mr. Sims was placed on suicide watch again after he reported putting a razor blade chip in his penis and rectum. *Id.*; dkt. 98-6 at 8. Ms. Kulynych does not have the authority to prescribe medication. Dkt. 98-3 ¶ 3.

Psychiatrist Dr. Bertsch first saw Mr. Sims on June 5. Dkt. 98-1 at ¶ 7. Mr. Sims was not on any psychiatric medication at that time. *Id.* He talked about "hearing voices" but showed no positive or negative signs of psychosis. *Id.* Dr. Bertsch determined that this was part of Mr. Sims' antisocial manipulation. *Id.* Mr. Sims also talked about being depressed and anxious in relation to the death of family members. *Id.* Dr. Bertsch encouraged him to discuss his symptoms with his therapist and fully comply with his treatment plan. *Id.* After discussing the possible benefits and side effects of venlafaxine XR (Effexor XR), Dr. Bertsch prescribed the medication. *Id.*

Mr. Sims was sent to the hospital on June 21 after he reported that he had swallowed a

5

handful of pills and a razor blade and put razor blades up his penis. Dkt. 98-3 at ¶ 20. The pills he said he took would have significantly lowered his blood pressure, but that did not occur. *Id.* at ¶ 22. X-rays revealed no trace of any razor blades. *Id.* The emergency room physician wrote, "I do not feel that this patient has ingested anything and perhaps alleged that he did to get out of jail for a few days." *Id.* Because Mr. Sims did not receive emergency treatment and had no sign of self-injury, it was determined that he still did not meet criteria for being assessed "seriously mentally ill." *Id.* The plan was for mental health staff to continue regular evaluations. *Id*.

On June 28, Mr. Sims told Ms. Kulynych he would continue to harm himself until he was transferred to his desired prison, which changed often. *Id.* at ¶ 23. She requested custody staff to initiate suicide watch again so that he was constantly observed. *Id.*

Based on Ms. Kulynych's personal experience as Mr. Sims' primary therapist in 2019, she believed he had a mental health diagnosis, but his behavior was always goal-oriented at getting what he wanted. *Id.* at ¶ 26. Every instance of self-harm had a goal in mind and occurred in response to a perceived stressor or interpersonal slight, after which he exhibited a period of calm in which he was more receptive to treatment-related discussions. *Id.* In Ms. Kulynych's professional opinion, Mr. Sims was not seriously mentally ill and did not need to be housed in a mental health treatment unit. *Id.* He was offered and received appropriate mental health treatment, but refused to comply with his treatment plan and chose instead to engage in behavior designed to control the conditions of his confinement. *Id*.

Dr. Bertsch saw Mr. Sims again in July, August, November, and December of 2019. Dkt. 98-1 at ¶¶ 8-12. He also saw him in February, March, and July of 2020. *Id.* at ¶¶ 13-15. Dr. Bertsch advised Mr. Sims that therapy was the preferred method of treatment for ASPD, but Mr. Sims refused therapy sessions of any kind. *Id.* at ¶ 6. At times, Dr. Bertsch prescribed different

serotonin and norepinephrine reuptake inhibitors, a class of medications that are effective in treating depression and anxiety disorders. *Id.*

At each session, Dr. Bertsch prescribed, adjusted, or discontinued various medications, including venlafaxine XR, ziprasidone, aripiprazole, fluoxetine, duloxetine, and mirtazapine, based on Mr. Sims' reports of effectiveness and side effects. *Id.* at ¶¶ 7-8, 10-13. Several times, Mr. Sims asked for specific medications: bupropion, trihexyphenidyl, buspirone and quetiapine. *Id.* at ¶¶ 11-13. Mr. Sims' reported symptoms were vague, and he was mostly irritated and demanding. *Id.* Dr. Bertsch made medical judgments based on his education, training, and experience in choosing to prescribe other medications. *Id.* at ¶ 19.

Dr. Sims' role on the multidisciplinary team is mostly supervisory. Dkt. 98-4 at ¶ 3. Dr. Sims had no direct contact with Mr. Sims until February 3, 2020, after he had filed this lawsuit. *Id.* at ¶ 12.

### III. ANALYSIS

At all relevant times, Mr. Sims was a convicted offender. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("[T]he Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendants knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016).

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d

403, 409 (7th Cir. 2014). The subjective standard "requires more than negligence and approaches intentional wrongdoing." *Goodloe v. Sood*, 947 F.3d 1026, 1030 (7th Cir. 2020) (internal quotation omitted). Even a showing of medical malpractice is not sufficient. *Id.* "Rather, the evidence must show that the prison official . . . knew or was aware of—but then disregarded—a substantial risk of harm to an inmate's health." *Id.*

### 1. Claim Against Ms. Inda

Mr. Sims alleges that Ms. Inda should have put him on suicide watch on May 7, 2019. "All agree that suicide is an objectively serious medical condition." *Lord v. Beahm*, 952 F.3d 902, 904 (7th Cir. 2020). "[P]rison officials cannot intentionally disregard a known risk that an inmate is suicidal." *Id.*

Although Ms. Inda disputes that Mr. Sims told her he wanted to kill himself, the Court accepts as true for purposes of the motion for summary judgment Mr. Sims' testimony that he told Ms. Inda that he was hearing voices that were telling him to kill himself. The undisputed record reflects that Ms. Inda was unaware that he had hoarded pills or had an unauthorized razor in his cell. In addition, Ms. Inda knew that Mr. Sims had been stable and had not demonstrated any self-harming behavior to this point while at Wabash Valley. She also knew he would see his therapist the next day. Finally, Mr. Sims did not require treatment at the hospital on May 7, and he has not presented evidence showing that he suffered a cognizable injury on that date. *See Lord,* 952 F.3d at 904-05 (affirming summary judgment for defendants where plaintiff made an insincere suicide threat and only inflicted minor razor blade scratches).

As noted, the subjective standard for deliberate indifference is high and requires a showing of more than gross negligence or malpractice. *Goodloe*, 947 F.3d at 1030. Here, no reasonable jury could find that Ms. Inda had a substantial basis for believing that Mr. Sims would or could

8

seriously harm himself that day.

### 2. Claim Against Ms. Kulynych

Mr. Sims alleges that Ms. Kulynych was deliberately indifferent to his serious medical condition when she refused him mental health treatment and lied about him not being SMI. Dkt. 98-5 at 44:2-7.[1]

Mr. Sims testified that he believed he should be automatically classified as SMI for one year thereafter because he had been housed at the New Castle mental health treatment unit. *Id.* at 48:14-17. His mental health treatment team at Wabash Valley, however, determined that he did not meet the criteria of being SMI. There is no designated evidence showing how he was classified when he was at New Castle. But even if he had been classified as SMI at New Castle, that would not have required that he be given the same designation at Wabash Valley. Each provider "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the [provider's] professional judgment and does not go against accepted professional standards." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012). No reasonable jury could find that members of the Wabash Valley treatment team, including Ms. Kulynych, failed to exercise their professional judgment in determining that Mr. Sims was not SMI.[2] An inmate's mere disagreement with a medical provider's judgment is not

---

[1] Mr. Sims also alleges that Ms. Kulynych talked about his past mental health issues and behavior with another inmate who served as Mr. Sims' "suicide companion" (an inmate assigned to observe and record Mr. Sims' behavior because he was on suicide watch). Dkt. 98-5 at 44:8-47:25. But these allegations are not so "humiliating" or "penologically irrelevant" as to make them actionable as an infliction of cruel and unusual punishment under the Eighth Amendment. *See Anderson v. Romero*, 72 F.3d 518, 523 (7th Cir. 1995) (not finding "any appellate holding that prisoners have a constitutional right to the confidentiality of their medical records" but noting that such an "action might conceivably constitute the infliction of cruel and unusual punishment" "if prison officials disseminated humiliating but penologically irrelevant details of a prisoner's medical history").

[2] Mr. Sims has presented no evidence showing that his treatment would differ if he were designated SMI. Dr. Sims testified that his care and treatment would not have changed because he was already in restrictive housing and he would have still been treated with therapy for ASPD. Dkt. 101-1 at ¶ 5.

9

enough to prove deliberate indifference. *Eagan v. Dempsey,* 987 F.3d 667, 690 (7th Cir. 2021) (citations omitted).

The record is undisputed that Ms. Kulynych attempted to engage Mr. Sims in therapy and he often refused. She met with him weekly at a minimum, until she left the facility. He did not arrive at Wabash Valley with any prescribed mental health medications, and the first month Ms. Kulynych saw him, she did not believe he required a referral for medication. After his attempts to harm himself, however, he was referred to Dr. Bertsch. Ms. Kulynych is entitled to summary judgment.

### 3. Claim Against Dr. Sims

Mr. Sims alleges that Dr. Sims is liable because she was the lead psychologist and the boss of Ms. Inda and Ms. Kulynych. Dkt. 98-5 at 65:16-18. He agrees that he never saw Dr. Sims prior to filing this lawsuit in 2019.

It is not enough for Mr. Sims to allege that Dr. Sims is liable under § 1983 because of her position as the "boss" of other mental health staff. "Individual liability under § 1983 . . . requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted). Moreover, there is no *respondeat superior* liability in § 1983 cases. "Liability under § 1983 is direct rather than vicarious; supervisors are responsible for their own acts but not for those of subordinates, or for failing to ensure that subordinates carry out their tasks correctly." *Horshaw v. Casper*, 910 F.3d 1027, 1029 (7th Cir. 2018); *see also Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). Individual liability "may be found where an official knows about unconstitutional conduct and facilitates, approves, condones, or turn[s] a blind eye to it." *Perez,* 792 F.3d at 781 (internal quotation omitted). There is no evidence that Dr. Sims was aware of any unconstitutional conduct on the part of her supervisees.

To the extent Mr. Sims contends that Dr. Sims failed to put him in a mental health treatment program, he did not request that of her at any time before filing this case. Dkt. 98-5 at 68:13-19. In addition, to the extent Dr. Sims was part of the team that evaluated Mr. Sims and determined that he was not SMI, his mere disagreement with that assessment is not enough to show deliberate indifference. Mr. Sims had been on a mental health unit at New Castle, but due to his lack of compliance with treatment, he was discharged from that unit. The undisputed record also shows that Dr. Sims ordered that he be put on suicide watch when he tried to injure himself. No reasonable jury could find that Dr. Sims ignored any substantial risk of serious harm to Mr. Sims. Therefore, Dr. Sims is entitled to summary judgment.

### 4. Claim Against Dr. Bertsch

Mr. Sims alleges that Dr. Bertsch was deliberately indifferent to his serious medical needs because Dr. Bertsch did not prescribe to him certain medications that he had previously been prescribed outside of prison, including bupropion (Wellbutrin), quetiapine (Seroquel), trihexyphenidyl (Artane), and buspirone (BuSpar). Dkt. 98-5 at 76:5-9; 80:12-15. During the relevant timeframe, Dr. Bertsch had multiple therapy sessions with Mr. Sims and in conjunction with his treatment prescribed, adjusted, or discontinued various medications. "[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…." *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011). Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id.*

Courts routinely reject prisoners' claims "based on a preference for one medication over another unless there is evidence of a *substantial* departure from acceptable professional judgment." *Lockett v. Bonson*, 937 F.3d 1016, 1024 (7th Cir. 2019). "[M]ere disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of

11

treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.* (internal quotation omitted). The undisputed evidence demonstrates that Dr. Bertsch exercised his professional judgment by prescribing and adjusting various medications in response to Mr. Sims' reports of side effects and effectiveness. *See Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 660 (7th Cir. 2021) (To show deliberate indifference, a "[p]laintiff must show a failure to exercise medical judgment at all.").

"[A] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Davis v. Kayira,* 938 F.3d 910, 915 (7th Cir. 2019) (internal quotation omitted). Mr. Sims has designated no evidence on which a jury could find that Dr. Bertsch's medication decisions fell outside the scope of professional judgment.

## IV.  CONCLUSION

For the reasons discussed above, the Defendants' motion for summary judgment, dkt. [96], is **granted.** Judgment consistent with this Entry shall now issue.

Mr. Sim's motion for assistance, in which he asks the Court to order Ms. Inda to stay away from him, dkt. [116], is **denied as moot** and because the Court does not the authority to issue such orders. Mr. Sim's second motion for assistance asking the Court to order the defendants to not give him crushed blood pressure medication, dkt. [120], is similarly **denied.**

**SO ORDERED.**

Date: 8/11/2021

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

JOHN SIMS
232623
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ  KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com